IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 15 CR 511 |
| v. | ) | Judge John Z. Lee |
| | ) | |
| ROLANDO GAMBOA | ) | |
| | ) | |
| Defendant | ) | |

**DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM**

Now comes the defendant, ROLANDO GAMBOA, by and through his attorneys, BREEN & PUGH, pursuant to Local Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3553(a), the Sixth Amendment to the Constitution of the United States, as well as the Supreme Court's opinion in *Gall v. United States*, 552 U.S. 38 (2007), respectfully submits the following supplemental brief in support of his Response to the Government's Motion for a Payment Order and Position on Sentencing.

**Introduction**

The Government's Motion for a Payment order requests that the Court direct Mr. Gamboa to pay back, within fourteen days of sentencing, any unaccounted for proceeds of his fraud which are deemed to still be in his possession or control. *See* Dkt. No. 48. Specifically, the Government argued that during the course of the cash-for-benefits scheme, Mr. Gamboa and his brother withdrew approximately $945,470 in cash from El Jarro's bank account, all of which constituted proceeds of the fraud.

Dkt. No. 49 at 2-3. The Government claimed that Mr. Gamboa failed to account for any scheme funds and therefore should be ordered to pay $945,470 shortly after his sentencing. *Id.* at 4.

Subsequently, Mr. Gamboa filed his sentencing memorandum and provided an accounting, arguing that he had used the money to: (1) purchase SNAP eligible food and beverage inventory; (2) purchase non-SNAP eligible inventory; (3) pay El Jarro's operating expenses; (4) purchase and maintain equipment; (5) pay employees' wages; (6) provide cash to customers as part of the cash-for-benefits scheme; and (7) pay personal living expenses. (Gamboa Sent. Memo at 16-19).

The Government partially agreed with Mr. Gamboa's accounting and acknowledged he should be credited for $676,887.89 of cash expenditures during the pendency of the scheme. (Govt. Sent. Memo at 16). Specifically, the Government credited Mr. Gamboa for cash spent on employee wages, cash given to customers in exchange for their SNAP benefits, and cash used to pay living expenses. *Id.* According to the Government the remaining unaccounted for scheme funds is only $277,582.11. *Id.*

On March 21, 2019, the Court entered and continued Mr. Gamboa's sentencing hearing and requested to hear testimony regarding El Jarro's cash expenditures. Dkt. No. 70. During this continuance, Mr. Gamboa's mother located records from El Jarro detailing the store's daily sales and the profit made from each cash-for-benefits transaction. Dkt. No. 71 at 2. At Mr. Gamboa's request, the Court rescheduled his sentencing hearing to allow both parties to review the records and submit

supplemental briefs addressing what effect, if any, the records have on the parties' accounting of the cash withdrawn from El Jarro's bank account. Dkt. Nos. 73, 74.

### El Jarro's Sales Records

The records document daily sales from October 2010 through April 2011 and consist of two types of documents, Link transaction receipts and daily cash register journals.

The Link receipts are individual slips of paper printed by the Link point of sale system following every Link transaction at El Jarro. *See* Exhibit 1. Each receipt indicates the date and time of the transaction, the beneficiary's account number, the initial Link account balance, the total amount of the transaction, and the beneficiary's remaining account balance after the transaction. *Id.* In addition to the printed transaction details, many Link receipts also include a dollar amount handwritten at the top of the receipt. *See* Exhibit 2. These receipts represent a fraudulent cash-for-benefits transaction, and the handwritten amount represents the profit El Jarro made from the transaction. By subtracting El Jarro's profit from the sale amount on the receipt, one can determine the amount of cash El Jarro gave to the customer in exchange for their benefits. In Exhibit 2, for example, the total transaction was for $151.08 of SNAP benefits. *Id.* Handwritten at the top of the receipt is "only $31.08." *Id.* This indicates El Jarro gave the beneficiary $120 in cash and only profited $31.08 from the fraudulent exchange.

The daily cash register journals are printed from El Jarro's register at the end of the day and appear to record sales that were keyed into the register. *See* Exhibit 3.

3

Additionally, there is a slip of paper attached to each register journal which lists what a daily accounting of income. *Id.*

Because of the voluminous nature of the records the parties agreed to review a two-month period as a sample set of the records. Counsel for Mr. Gamboa created a spreadsheet documenting the data on each Link receipt and daily cash register journal for November 2010 through December 2010.

## Argument

The Government's accounting, despite giving Mr. Gamboa credit for some cash expenditures, is inaccurate. *See* Govt. Sent. Memo at 16. Specifically, the Government overestimates the amount of profit El Jarro made from the cash-for-benefits transactions and fails to credit Mr. Gamboa for cash used to purchase SNAP eligible food and beverage inventory. The recently produced sales records highlight these shortcomings and demonstrates that Mr. Gamboa has accounted for all of the cash withdrawn from El Jarro's bank account.

### I. El Jarro Profited an Average of Thirty Cents for Every Dollar of Benefits Redeemed

Cash-for-benefit frauds require stores to maintain and distribute significant amounts of cash. In order to pay SNAP beneficiaries willing to exchange their benefits for a discounted amount of cash, stores need cash on hand to distribute as part of the fraudulent exchanges. Thus, a significant portion of the SNAP funds redeemed by El Jarro were withdrawn as cash and subsequently used to operate the cash-for-benefits fraud.

Acknowledging this fact, the Government agreed to credit Mr. Gamboa for $502,843.89 of cash paid out to SNAP beneficiaries during the scheme. (Govt. Sent. Memo at 15-16). The Government reasoned that El Jarro paid beneficiaries fifty cents for every dollar redeemed, that El Jarro redeemed a total of $1,005,678.78 in fraudulent SNAP benefits, and therefore El Jarro paid $502,843.89 to the beneficiaries.[1] *Id.* Put more simply, the Government argues that beneficiaries received 50% of the benefits they redeemed in a single transaction and El Jarro kept the other 50% as profit.

However, the Government's calculation is flawed as it underestimates the amount of cash El Jarro actually paid for each dollar of benefits redeemed. A review of the individual Link receipts in which a fraudulent cash-for-benefits transaction is indicated demonstrates that El Jarro paid an average of seventy-seven cents for every dollar of benefits redeemed. *See* Exhibit 4. In other words, beneficiaries were paid an average of 77% of the benefits they redeemed in a single transaction and El Jarro kept the remaining 23% as profit. *Id.*

Indeed, there was a total of $173,123.95 redeemed through fraudulent transactions. Of that amount, the beneficiaries were paid $132,700.11, or 76.6%, and El Jarro retained $40,423.84, or 23.3%. *Id.*

The chart in Exhibit 4 lists every SNAP transaction from November 2010 through December 2010 that has been identified as fraudulent by the handwritten

---

[1] If El Jarro redeemed benefits at a rate of fifty cents for every dollar of benefits redeemed and El Jarro redeemed 1,005,678.78 in fraudulent benefits, El Jarro would have paid out $502,839.39 to the beneficiaries.

5

dollar amount at the top of the receipt.[2] Each entry shows the total amount of the transaction, if any money went towards a legitimate purchase, the amount of cash given to the beneficiary, the profit El Jarro made from the transaction, and if any money was applied to an IOU. *Id.* The chart then calculates the percentage of the transaction given to the beneficiary in cash and the percentage retained by El Jarro as profit. *Id.*

For example, on November 1, 2010 there is transaction for $155.99. *Id.* at 1. At the top of the Link receipt "35.99" is handwritten, indicating El Jarro gave the customer $120 in cash and profited $35.99 from the fraudulent transaction. *See* Exhibit 5. Of the total transaction, the customer received 77% of the money and El Jarro's profit was 23% of the transaction. Exhibit 4 at 1.

Similarly, on November 1, 2010 there is a transaction for $260.77. *Id.* at 1. Handwritten at the top of the Link receipt is "60.77," indicating El Jarro gave the customer $200 in cash and profited $60.77. *See* Exhibit 6. As with the previous example, the customer received 77% of the money charged to their Link account and El Jarro profited the remaining 23%. Exhibit 4 at 1.

Exhibit 4 lists approximately 935 cash-for-benefits transactions that occurred between November 2010 and December 2010. Of these transactions, there were 643 in which beneficiaries were paid 77% or more for their benefits, there were 232 in which beneficiaries were paid 70% to 76% for their benefits, and there were only 67

---

[2] There are approximately seventy-eight transactions from this period of time that Mr. Gamboa is missing the corresponding Link receipt. Therefore Mr. Gamboa is unable to determine whether the transaction was a legitimate purchase or a fraudulent cash-for-benefits exchange.

where the beneficiary received less than 70% of their benefits. On average, beneficiaries received 77% of the benefits redeemed and El Jarro received the remaining 23%.

These records clearly demonstrate that El Jarro was paying beneficiaries an average of seventy-seven cents for every dollar of benefits redeemed. Therefore, if El Jarro redeemed $1,005,678.78 in fraudulent SNAP benefits, El Jarro paid out approximately $774,372.33 in cash to beneficiaries, $271,528.44 more than the Government's calculation.

The Government's accounting concluded that there is $277,582.11 of unaccounted for scheme funds. (Govt. Sent. Memo at 16). However, accounting for the $271,528.44 in payments to beneficiaries the Government failed to credit Mr. Gamboa, there would remain only $6,053.67 of alleged unaccounted for scheme funds.

## II.  El Jarro Purchased SNAP Eligible Food and Beverage Inventory With Cash

The Government characterized Mr. Gamboa's claim that El Jarro purchased half of the store's inventory with cash as "made up" and "completely unreliable." *Id.* at 13. The Government made this argument even when presented with pictures showing El Jarro stocked SNAP eligible beverage products despite there being no corresponding checks written to a distributor of those products. (Gamboa Sent. Memo at 12-13). Further, the Government ignored that the amount of checks written to other beverage distributors were not sufficient to stock the companies' products over the forty-one months El Jarro was in business. *Id.* at 13. The only explanation for El Jarro stocking products without records of payments to a distributor, or stocking

7

products with minimal checks written to the distributor, is that El Jarro purchased that inventory with cash. *Id.*

From January 2008 through May 2011, El Jarro wrote $245,024.12 in checks to food and beverage vendors. *See* Exhibit 7. This is an average of $5,976.20 a month to stock SNAP eligible food and beverage products. Using the Government's method to calculate loss, after adding a thirty-five percent retail markup, El Jarro's average monthly sales would be approximately $8,067.87. (Govt. Sent. Memo at 12; Gamboa Sent. Memo at 9-10).

| Time Frame | Average Monthly Sales | Cost of Inventory |
|---|---|---|
| January 2008 – May 2011 | $8,067.87 | $5,976.20 |

El Jarro's sales records, however, demonstrate that only relying on checks written to food and beverage vendors underrepresents the amount of inventory El Jarro purchased. Indeed, the Link receipts, which do not indicate a fraudulent transaction, establish that El Jarro's total sales are significantly greater than the average monthly sales when calculated only considering checks written to food and beverage vendors. *See* Exhibit 8; Exhibit 9.[3] Consequently, the amount El Jarro would have had to spend on inventory to sell that amount of product is greater than the average monthly cost of inventory as reflected by El Jarro's checking account. *Id.*

| Month | Link Receipt Sales | Cost of Inventory |
|---|---|---|
| November | $15,683.89 | $11,617.70 |
| December | $15,336.89 | $11,360.66 |

---

[3] Exhibit 8 and Exhibit 9 represent all Link card purchases where there is no handwritten dollar amount at the top of the receipt showing a cash-for-benefits exchange took place, or there is evidence that a legitimate purchase accompanied a cash-for-benefits exchange.

8

El Jarro spent approximately $5,000 more each month on inventory than is reflected by the monthly average of checks written to food and beverage vendors:

| Month | Cost of Inventory | Checking Account Average | Difference |
|---|---|---|---|
| November | $11,617.70 | $5,976.20 | $5,641.50 |
| December | $11,360.66 | $5,976.20 | $5,384.46 |

Thus, over the forty-one months El Jarro was open, the store would have purchased approximately $205,000 of inventory with cash.

Even if we were to consider every transaction over $100 from Exhibits 8 and 9 as fraudulent, the remaining SNAP transactions still show there was significantly more sales than what can be estimated by solely reviewing the checks written to vendors. *See* Exhibit 10; Exhibit 11.

| Month | Link Receipt Sales | Cost of Inventory |
|---|---|---|
| November | $12,209.21 | $9,043.86 |
| December | $11,256.09 | $8,337.84 |

This still results in considerably more money being spent on inventory than what is reflected by El Jarro's banking records.

| Month | Cost of Inventory | Checking Account Average | Difference |
|---|---|---|---|
| November | $9,043.86 | $5,976.20 | $3,067.66 |
| December | $8,337.84 | $5,976.20 | $2,361.64 |

Over the forty-one months El Jarro was open, the store still would have had to purchase approximately $94,000 to $125,000 of inventory with cash.

Mr. Gamboa recognizes that these are not exact calculations, however, they demonstrate that relying solely on the checks written to food and beverage vendors

9

underestimates the amount of inventory El Jarro purchased. The Link receipts show El Jarro was selling more SNAP eligible food and beverage products than can be accounted for by reviewing the store's bank records. The only conclusion is that El Jarro was purchasing some of its SNAP eligible inventory with cash.

## Conclusion

Mr. Gamboa has fully accounted for the cash withdrawn from El Jarro's bank account. The Government's accounting underestimated the money paid to beneficiaries by approximately $271,528.44 and failed to give Mr. Gamboa any credit for SNAP eligible inventory purchased with cash. Taking these cash expenses into consideration there remains no unaccounted-for scheme funds that Mr. Gamboa can be deemed to still control. Wherefore, Mr. Gamboa respectfully requests the Court deny the Government's motion for a payment order.

Respectfully submitted,

/s/ Robert W. Stanley

BREEN & PUGH
53 West Jackson Blvd., Suite 1215
Chicago, Illinois 60604
(312) 360-1001